IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA                    15-CR-6095CJS

        -vs-                                **UNITED STATES'**
                                            **POST-HEARING**
IAN D. GOOLSBY,                             **MEMORANDUM OF LAW**

             Defendant.

_____


The United States of America, through its attorney, William J. Hochul, Jr., United States Attorney for the Western District of New York, Charles E. Moynihan, Assistant United States Attorney, of counsel, does hereby make and file its response to the defendant's motion requesting suppression of evidence seized from the blue 2015 Chevrolet Cruz in the area of Fifth Street and Madison Avenue, Elmira, New York, as well as the suppression of the defendant's statements made during the course of the stop by police.


**PROCEDURAL HISTORY**


The defendant, Ian D. Goolsby, currently stands indicted in a five-count Indictment charging him with various drug trafficking and related firearms possession offenses stemming from his possession of heroin, marijuana and a semiautomatic pistol on March 11, 2015. Goolsby, in his omnibus motions, has moved to suppress certain evidence and statements as outlined below.   An evidentiary hearing was conducted on February 1, 2016, at which Elmira Police Investigator Ronald Gunn and Elmira Police Officer David Miller testified as witnesses for the United States.   The defense did not present any proof at the hearing.

For those reasons stated below, the United States opposes Goolsby's various motions to suppress.  If not specifically stated, the United States generally opposes all requests of Goolsby related to these motions.

## FACTS

On March 11, 2015, at approximately 10:03 AM, Investigator Ronald Gunn, a fourteen year veteran of the Elmira Police Department, began receiving text messages from Susan Henry.  The messages relayed that Goolsby was in front of her house, that he had heroin and a firearm in a car and that they were getting ready to leave.  (Government's Exhibit 1; Record at 8-9, 10, 11-12, 15.)   While the text messages did not mention Goolsby by name, Gunn understood Henry to be talking about Goolsby.   (Record at 25.)   Gunn was engaged in an unrelated investigation and was unable to follow-up.   (Record at 11.)

Gunn had developed a rapport with Henry because she was friends with Gunn's girlfriend and, while Henry had since moved, she had lived in the same area as Gunn. (Record at 10.)   Gunn knew that Henry had a criminal record but was unsure of the nature of the convictions.   (Record at 19-20.)   He did not see Henry socially and provided the telephone number to his work cellular telephone once Henry "started talking to [him] about Mr. Goolsby . . ." having a firearm in his room at the Holiday Inn about three weeks before this arrest.  (Record at 20-21, 29.)   Gunn assumed that Henry contacted him because she

was involved in a romantic relationship with Goolsby and that she was upset because Goolsby was at the Holiday Inn with another woman.  (Record at 29.)   Henry had previously provided information to law enforcement which had been corroborated and assisted law enforcement with investigations.  (Record at 17-18.)   As far as Gunn knew, Henry was not a contract informant for law enforcement, she was not paid for information and did not receive any benefits for providing information.   (Record at 18-19.)

Initially, Gunn did not see that Henry had provided information upon which officers could act.   However, he forwarded the information to Elmira Police Investigator Jeremy Oakes, who was with the Drug Enforcement Unit, once she texted that Goolsby was in front of her house, was getting ready to leave, asked if she would be kept out of the investigation and Goolsby had heroin "in a black lunch bag."  (Record at 14-16; <u>See</u> Government's Exhibit 1.)  Oakes told Gunn that he would go to Henry's house to attempt to see the car leaving.  (Record at 25.)

Investigator Oakes went to Henry's house, which was on Decker Place, to watch the car.  He also contacted Officer David Miller, a seven-year veteran police officer with the Elmira Police Department, and told him about Goolsby having a handgun and drugs inside of his car.  (Record at 31-32, 33, 65-66.)  While on College Avenue, Miller saw the car, which was a four-door Chevrolet Cruz, turn onto College Avenue from Decker Place and travel north.  (Record at 32, 34.)  He knew this to be the car he was looking for because Oakes had told him what the car looked like, as well as the license plate number.  (Record at

39-40.)   When the car came to the "T-intersection" of College Avenue and Fifth Street, Miller saw that the operator did not activate the turn signal until it stopped at the intersection. (Record at 32, 34.)   The car then turned east on to Fifth Street.   (Record at 34-35.)   Miller, who was driving a marked Elmira Police Department Chevy Tahoe, stopped the car for violating the New York State Vehicle and Traffic Law on Fifth Street near Madison Avenue.[1] (Record at 32-33, 34, 37-38, 41.)   Notwithstanding the apparent traffic law violation, Miller intended to stop the car because of the information law enforcement received from Henry. (Record at 36, 65.)

During his testimony, Miller said:

> Once he stopped I approached the vehicle, I talked to the driver, which was Mr. Goolsby, told him why he was stopped and asked him if he had his license on him.
>
> He said he didn't have his license on him at that time. When I approached the vehicle I could smell the odor or marijuana.   I waited for back up to get there.   When they did I went over to the passenger side and I spoke with the passenger. I could still identify her by her name and date of birth.   I could still smell the odor of marijuana.
>
> Record at 41-42.

When Miller approached, the car window was already down and he introduced

---

[1] The New York State Vehicle and Traffic Law states, in pertinent part, "No person shall so turn any vehicle without giving an appropriate signal in the manner hereinafter provided." NYS Veh. & Traf. Law § 1163(a).   The Vehicle and Traffic Law further states, "A signal or intention to turn right or left when required shall be given continuously during not less than the last one hundred feet traveled by the vehicle before turning."   NYS Veh. & Traf. Law § 1163(b).

himself to Goolsby.   (Record at 43-44.)   Miller saw that Goolsby was in the driver's seat. (Record at 42, 75.)   Miller asked Goolsby for his license, which Goolsby did not have. (Record at 44.)   Miller told Goolsby why he had stopped him and Goolsby said the Miller was right and offered an apology.   (Record at 43.)   Miller "immediately" smelled burnt marijuana, which he recognized from his training and past experiences, as soon as he walked up to the car and when he was standing inches outside of the car door speaking with Goolsby. (Record at 43-44, 45, 68.)

When Goolsby did not produce a driver's license, Miller wrote down his name and his date of birth and then spoke with the passenger, who he knew to be the one who provided the information about the gun and drugs to Gunn.   He identified her as Susan Henry, but also knew her to go by the name Susan Hamilton.   (Record at 45, 66-67.)   He could still smell the marijuana while standing on the passenger side of the vehicle.   (Record at 46.)

Once another officer arrived, Miller asked Goolsby about the smell of marijuana. Goolsby said that he smoked marijuana earlier in the day.   (Record at 46, 69.)   Miller did not issue Miranda warnings.   (Record at 69.)   Miller then asked Goolsby to get out of the car.   (Record at 46.)   Goolsby told Miller he wanted to speak with Miller's supervisor. Miller said that Goolsby would be able to do that but said that Goolsby still needed to get out of the car so law enforcement could search it.   (Record at 46-47.)   Goolsby then demanded to speak with Miller's supervisor immediately.   Miller offered to have his supervisor come to the scene but, again, told Goolsby he had to get out of the car to allow the search.   (Record at

47.)   Miller saw that Goolsby became extremely nervous and visibly tense and assumed a combative demeanor once he asked Goolsby to get out of the car.   (Record at 47.)   Prior to this, Goolsby was very calm and cooperative.   (Record at 47.)   The second time that Miller asked Goolsby to get out of the car, Miller opened the door and Goolsby stepped out.   Miller patted Goolsby down, found nothing, and Goolsby stood approximately eight feet back from his vehicle with Officer Shaw, another Elmira Police Department officer.   (Record at 47, 71.) Henry also exited the car.   (Record at 48.)

Miller searched Goolsby's car after the occupants exited.   The search was motivated by information Oakes had provided to Miller that there was a handgun in the front of the car on the passenger side in a brown shoebox and that drugs would be in the car in a black lunch box.   (Record at 49.)   When he was speaking with Goolsby, Miller could see a brown shoebox on the front passenger-side floor and a black lunch box in the rear driver's side passenger seat.   (Record at 49.)   Further, Miller believed that, based upon the smell of burnt marijuana, that he could search the car, which he did.   (Record at 49.)

Because of the information they had at the time, Miller first went to the passenger-side and opened the door.   He saw green plant material which he believed, and later confirmed through a field test, to be marijuana, in the carpet area between the passenger seat and the passenger door.   (Record at 50, 54-55, 62, 69-70, 71.)   Miller also found marijuana on the floor between the driver's side seat and the console.   (Record at 70.)   He saw the brown shoebox on the floor, opened it and saw a yellow plastic bag inside.   The plastic bag was

folded up and wrapped around something which looked like a handgun wrapped in the plastic bag.   (Record at 50, 71-72.)   Miller opened the plastic bag and saw a red rag wrapped around "what still looked like a gun."   (Record at 50.)   Also, Miller saw that the object had the weight and feel of a gun when he picked it up.   (Record at 50.)   Miller took the rag off and saw it was a handgun, confirming his beliefs.   (Record at 50.)   He could see that the magazine, which was loaded with ammunition, was kept in the brown shoe box outside of the handgun.   (Record at 55.)   The serial number on the firearm had been removed. (Record at 60.)   Inside of the yellow plastic bag, Miller also found additional micro ziplock bags, often used to package drugs for distribution.   (Record at 55.)

Officers then handcuffed Goolsby and Henry and placed the handgun in Miller's police car.   (Record at 50, 72.)   Miller did not photograph the handgun as he found it in Goolsby's car because he wanted to secure it quickly.   Goolsby's car was next to a business and uninvolved people were in the area.   Put simply, Miller was concerned about public and officer safety.   (Record at 50-51.)

Next, Miller searched the rear-passenger area, finding nothing, followed by the front-driver's side area, in which he found Western Union correspondence addressed to Goolsby, among other papers.   (Record at 53, 56, 58, 73.)   On the seat behind the driver, Miller saw a black lunch box, which was zipped closed, matching the description provided by Oakes.   (Record at 53-54, 72.)   Miller opened the lunch box and found a plastic container with uncooked rice inside, which he knew from his training and experience was often used to

keep heroin dry.   (Record at 53-54.)   Inside of the container, Miller found glassine envelopes containing a substance he believed to be heroin, a fact later confirmed by a field test.   (Record at 54, 62.)

During the search, Miller found a cellular telephone and saw that the keys to the car were in the ignition.   (Record at 57.)   Miller also searched the trunk and found men's clothing in a suit case.   (Record at 56, 73.)   Law enforcement gave the clothing to Henry at Goolsby's request.   (Record at 56-57, 73.)

Oakes found that Goolsby's car was the property of a rental company, which took the vehicle from the scene.   Officers did not inventory the contents of the car and did not seek a search warrant for the car.   (Record at 63, 73.)

## ISSUE PRESENTED

I.   Whether the search of the blue Chevrolet Cruz being driven by Goolsby on March 11, 2015, complied with the Fourth Amendment.

II.   Whether the statements made by Goolsby to officers during the traffic stop on March 11, 2015, were taken in violation of his rights.

I.      **The search of Goolsby's motor vehicle was proper because it was reasonable to believe that Goolsby's vehicle would contain evidence of the crime for which Goolsby was placed under arrest.**

A.      **Legal Standard**

Searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment.   Only a few specifically established and well-delineated exceptions permit such searches.   Katz v. United States, 389 U.S. 347, 357 (1967).   A search incident to a lawful arrest is one of the exceptions to the search warrant requirement.   See Weeks v. United States, 232 U.S. 383, 392 (1914). "Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest."   Arizona v. Gant, 556 U.S. 332, 351 (2009).   Without one of these two justifications present, a search of an arrestee's vehicle is not permitted without a search warrant unless law enforcement shows that another exception to the search warrant requirement applies.   Id.

The first prong of the Gant analysis authorizes a search of an occupant's vehicle only if the arrestee is within reaching distance of the passenger compartment.   The second prong in the Gant analysis authorizes warrantless searches of a vehicle incident to arrest when it is "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." Gant, 556 U.S. at 343, quoting Thornton v. United States, 541 U.S. 615, 632 (2004).   The

Supreme Court in <u>Gant</u> did not state whether the "reasonable to believe" standard is equivalent to probable cause, reasonable suspicion, or some level of certainty between these two levels.   Also, the second prong of the <u>Gant</u> analysis does not directly say whether a court should employ a categorical approach in which reasonableness of the belief is based upon the offense of arrest rather than the facts known to the officer.   See <u>Arizona v. Gant</u>, 556 U.S. 332 (2009).

However, the <u>Gant</u> Court appears to say that the second prong of the analysis does suggest that the justification for a vehicle search incident to arrest comes automatically from the crime of arrest provided that the crime of arrest is the type for which relevant evidence might be found in the vehicle.   This discussion seems to refute the conclusion that the officer's knowledge of specific facts giving rise to probable cause or reasonable suspicion that the suspect's vehicle contains evidence would be the basis upon which to justify a vehicle search incident to arrest.   See <u>Arizona v. Gant</u>, 556 U.S. 332 (2009).

The <u>Gant</u> Court emphasized the difference between traffic offenses and drug offenses in stating, "In many cases, as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence." <u>Gant</u>, 556 U.S. at 343, <u>citing</u> <u>Atwater v. Lago Vista</u>, 532 U.S. 318, 324 (2001); <u>Knowles v. Iowa</u>, 525 U.S. 113, 118 (1998).   The Supreme Court, in <u>Gant</u>, also stated, "But in others . . . the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein." <u>Id.</u> at 344.   The <u>Gant</u> Court specifically referred to <u>Thornton</u>

v. United States, 541 U.S. 615, 632 (2004), and New York v. Belton, 453 U.S. 454 (1981).

Both cases concerned drug offenses.


**B.      Argument**


Miller's search of Goolsby's vehicle was proper as incident to lawful arrest.   First, he and fellow officers had received information from Henry that Goolsby was committing drug and firearms crimes.   Second, Miller smelled burnt marijuana.


In the instant case, the second prong of the Gant analysis, that of a reasonable belief that evidence would be present, supports the officer's actions in searching Goolsby's vehicle. Miller could reasonably believe that the vehicle contained evidence of the offense for which Goolsby was placed under arrest.[2]   Initially, Miller stopped the vehicle because he received information, which originally came from Henry, that Goolsby had a gun and drugs inside the car.   (Record at 32-33, 36, 65-66.)   "Probable cause may be based on a tip from a confidential or anonymous informant, provided that the tip is sufficiently reliable."   United States v. Zimmerman, 86 F.Supp.3d 124, 130 (N.D.N.Y. 2015) quoting United States v. Herron, 18 F.Supp.3d 214, 225 (E.D.N.Y. 2014).   "Where an informant's statements form the basis of a law enforcement officer's assessment of probable cause, the informant's 'veracity, reliability and basis of knowledge' are among several relevant considerations to be

---

[2] Indeed, a United States grand jury returned an Indictment which charged Goolsby with, among other things, possessing heroin and marijuana, as well as charges related to firearms possession.

balanced, as is the extent to which the informant's statements are corroborated by independent police work." Zimmerman, 86 F.Supp.3d at 130 quoting United States v. Johnson, 2013 WL 150107, 4 (S.D.N.Y. 2013).


The information Henry provided formed a reasonable basis to believe the vehicle contained evidence for the offenses Henry said Goolsby was committing; heroin and firearm possession.  Henry's information provided probable cause to arrest Goolsby for these offenses even prior to Miller approaching Goolsby's car.  Henry was a known person and accountable to the police should the information she provided turned out to be false. (Record at 10.)  Law enforcement knew Henry lived on Decker Place because they went there in response to her information.  (Record at 32.)  Further, she had a history of reliability.  (Record at 17-18.)


Miller's observations independently corroborated Henry's information.  Henry's information described Goolsby in front of her house and driving away.  (Government's Exhibit 1.)  Miller saw the 2015 Chevrolet Cruz driving from Decker Place onto College Avenue.  (Record at 32-33.)  Henry said that Goolsby had placed a handgun at her feet on the passenger's side of the car.  Indeed, one of her texts said, "Gun by my feet in b."  (See Government's Exhibit 1; Record at 15-16.)  Miller saw a shoebox on the floor of the passenger's side and found a handgun inside.  (Record at 49-50.)  Henry said that Goolsby had heroin in a black lunch bag which was in the car.  (See Government's Exhibit 1; Record at 15-16.)  Miller saw a black lunch bag matching the description Henry provided in the

rear driver's side area.   Miller found heroin inside.   (Record at 53.)   The search of Goolsby's vehicle, and the recovery of the evidence which the defense now seeks to suppress, was justified because Miller had a reasonable basis to believe that the vehicle contained evidence of heroin and firearm possession charges.   The Court should deny Goolsby's motion to suppress tangible evidence.

Independently, Miller saw Goolsby violate the New York State Vehicle and Traffic Law by not properly signaling a turn.   (Record at 32-33.)   When Miller approached the vehicle, he smelled burnt marijuana.   (Record at 43-44.)   Once asked, Goolsby said that he smoked marijuana earlier in the day.   (Record at 46, 69.)    The burnt marijuana smell provided ample basis to justify Miller's subsequent search of Goolsby's car for marijuana. United States v. Brock, 2015 WL 8732432, 9 (W.D.N.Y. 2015) citing United States v. Wiggins, 2013 WL 1645180 (W.DN.Y. 2013).

Case law would permit any search of the vehicle subsequent to this arrest.   It is reasonable to believe that a vehicle in which Goolsby was driving at the time of his arrest would contain evidence of a drug crime as he was initially placed under arrest for a drug crime.   See Thornton v. United States, 541 U.S. 615, 632 (2004); New York v. Belton, 453 U.S. 454 (1981).    Miller's subsequent search of the passenger compartment of the defendant's vehicle was proper.   Gant, 556 U.S. at 343.   Having authority to conduct a search of the car based upon this information, the suspected marijuana Miller saw was

located in plain view, and thus the product of a lawful search.[3]   In addition to the marijuana, Miller properly found and seized the remaining items, including the firearm, magazine, ammunition, plastic bag, red rag, shoebox, drug packaging material, lunch bag, rice, heroin, cellular telephone and other indicia of control over the vehicle and contents.   The Court should deny Goolsby's motion to suppress tangible evidence.

## II.   **The search of Goolsby's motor vehicle was proper under the automobile exception to the search warrant requirement.**

### A.   **Legal Standard**

The automobile exception to the warrant requirement provided an independent justification for the warrantless search of Goolsby's car even if Gant does not authorize the search.   The automobile exception "permits law enforcement to conduct a warrantless search of a readily mobile vehicle where there is probable cause to believe that the vehicle contains contraband."   United States v. Navas, 597 F.3d 492, 497 (2d Cir. 2010) citing Pennsylvania v. Labron, 518 U.S. 938, 940 (1996); see also United States v. Dixon, 2010 WL 3167381, 3 (W.D.N.Y. 2010).   If an officer has probable cause to believe that a vehicle contains contraband, the officer may search anywhere in the vehicle that the contraband may be located.   This includes any containers or packages.   Navas, 597 F.3d at 497.   Officers

---

[3]Under the plain view exception, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant."   Minnesota v. Dickerson, 508 U.S. 366, 375 (1993).

have probable cause when the officer detects the smell of a controlled substance coming from the vehicle.   See United States v. Humphries, 372 F.3d 653, 658 (4th Cir. 2004); see also United States v. Brock, 2015 WL 8732432, 9 (W.D.N.Y. 2015); United States v. Wiggins, 2013 WL 1645180, 12 (W.D.N.Y. 2013).


**B.     Legal Standard**


In this case, Miller not only smelled marijuana, Goolsby admitted to possessing such, albeit earlier in the day.   (Record at 46, 69.)   Under such circumstances, Miller's warrantless search of the vehicle and any containers in which heroin and the handgun, as well as other items of evidence, were found was authorized.   Further, for the reasons argued above, the information provided by Henry provided independent probable cause to search the vehicle under the automobile exception.   Miller properly recovered the heroin, the handgun, as well as other items of evidence from Goolsby's car.   The Court should deny Goolsby's motion for suppression on this ground as well.


**III.    The statements made by Goolsby while he was under arrest were not taken in violation of his Constitutional rights.**


**A.     Legal Standard**


The "special procedural safeguards outlined in Miranda are required not where a suspect is simply taken into custody, but rather where a subject in custody is subjected to

interrogation." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300 (1980).   For <u>Miranda</u> safeguards to apply, law enforcement must interrogate a suspect, that is question him in such a manner as to reflect "a measure of compulsion above and beyond that inherent in custody itself."   <u>Id.</u> As such, law enforcement is required to administer <u>Miranda</u> warnings only when a suspect, who is in custody, is subjected to questioning, or its "functional equivalent." <u>Id.</u> at 300-01. '[T]he term "interrogation" under <u>Miranda</u> refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response.' <u>Id.</u> at 301.   "But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." <u>Id.</u> at 301-02.

Further, questioning by law enforcement during traffic stops does not require police to issue <u>Miranda</u> warnings provided that the motorist is not subject to treatment that "renders him 'in custody' for practical purposes . . ." <u>United States v. Mitchell</u>, 2012 WL 6827387, 10 (W.D.N.Y. 2012), <u>citing</u> <u>Berkemer v. McCarty</u>, 468 U.S. 420, 440 (1984).   Police officers may briefly detain a person for investigative purposes if that officer reasonably suspects criminal activity supported by articulable facts.   <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989); <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968).   In determining if reasonable suspicion exists, courts look at the totality of the circumstances through the eyes of a reasonable police officer guided by training and experience.   <u>United States v. Colon</u>, 250 F.3d 130, 134 (2d Cir. 2001).

"When a seizure of a person remains at the stop and frisk inquiry level and does not constitute a restraint on his or her freedom of movement of the degree associated with a formal arrest, <u>Miranda</u> warnings need not be given prior to questioning."   <u>United States v. Robinson</u>, 2005 WL 711623, 5 (W.D.N.Y. 2005).

In <u>United States v. Newton</u>, the Second Circuit noted that the Supreme Court in <u>Berkemer</u> identified, "two factors as particularly relevant to determining whether a lawful investigatory stop involves restraints generally associated with a formal arrest.   The first is whether a reasonable person in the suspect's shoes would have understood that his detention was not likely to be temporary and brief.   The second is whether a person stopped under the circumstances at issue would feel that he was completely at the mercy of the police."   369 F.3d 659, 675 (2d Cir. 2004).

**B.     Argument**

The Court should deny the suppression of the statements made by Goolsby during this investigation.   Even though Miller did not issue Miranda warnings, Goolsby's statement that he did not have a driver's license after Miller asked him if he had one, was not the product of custodial interrogation.   Neither was his statement to Miller acknowledging responsibility and apologizing for failing to signal his turn.   Likewise, his statement acknowledging that he possessed marijuana earlier was not the product of custodial interrogation.   The record is clear that Miller had only just approached Goolsby's car at that

point.   Nothing about the encounter up until this point suggests it was tantamount to Goolsby being custody.   Goolsby was still inside of his vehicle.   He was not handcuffed until later.   (Record at 41, 43, 44, 46, 50, 69, 72.)

Likewise, the Court should decline to suppress the statement made by Goolsby in which he demanded, several times to speak with Miller's supervisor.   (Record at 46-47.) While Miller had directed Goolsby out of the car prior to these statements, Goolsby's demands to see Miller's supervisor were not the product of police interrogation.   Miller's directions to exit the car could not reasonably be seen as resulting in these statements. Rather, the statements, which were not the product of any interrogation, are more appropriately described as being spontaneous in nature.   As such, the Court should deny suppression of this statement as well.

## CONCLUSION

For the foregoing reasons, the defendant's various motions to suppress evidence should be denied.

Dated: Rochester, New York
          June 3, 2016

<div style="margin-left:40%">

WILLIAM J. HOCHUL, JR.
United States Attorney

By:     s/CHARLES E. MOYNIHAN
          Assistant United States Attorney
          United States Attorney's Office
          100 State Street
          Rochester, New York 14614
          (585)263-6760, ext. 23971
          charles.moynihan@usdoj.gov

</div>

To: Steven Slawinski, Esq.

ˇ18ˇ